DAVID J. COHEN, ESQ.
California Bar No. 145748
**BAY AREA CRIMINAL LAWYERS, PC**
300 Montgomery Street, Suite 660
San Francisco, CA 94104
Telephone: (415) 398-3900
Facsimile: (415) 398-7500

Attorneys for Defendant **Irvin Griffin**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR S-06-451 EJG |
| Plaintiff, | ) | |
| v. | ) | **DEFENDANT IRVIN GRIFFIN'S** |
| IRVIN GRIFFIN, | ) | **SENTENCING MEMORANDUM** |
| Defendant. | ) | |

**I.**

**INTRODUCTION**

Irvin Griffin was born December 14, 1986 to Daphne Griffin. He grew up in the Pittsburgh/Antioch area of eastern Contra Costa County. The environment he was born into can only be characterized as hard, sad, and unforgiving. The neighborhood was also dangerous and high crime. Mr. Griffin's upbringing and his eventual arrest follows a predictable, sad, pattern. African-American children who are born into poverty, raised in violent, drug infested neighborhoods, by single mothers, are very likely to end up in prison for one reason or another. A child born into this environment has very little chance of succeeding as a

1

normal, healthy adult. Unfortunately, our prison system is full of persons who are born into this predicament. It is well accepted, that children are a product of their environment combined with their genetics. Mr. Griffin was born into a hostile environment and was not provided the nurture and care that a normal healthy baby is usually given.

For the first 6-7 years of his Mr. Griffin's life, arguably the time at which a child is the most susceptible to what is going on in their immediate environment, Mr. Griffin's father would routinely come by the house, demand money from Mr. Griffin's mother to buy crack cocaine, and when he his mother would refuse, his father would drag his mother around by her hair, punch her with a closed fist, and jump all over. His father would do this in front of the children. His father was also verbally abusive and manipulative. His father rarely if ever showed any affection or concern for the welfare of Mr. Griffin.

Eventually the violence became so severe, that Mr. Griffin's mom got a restraining order against his father, and she was able to extricate herself and her kids from that abusive situation. However, Irvin spent his formative years, from the age of approximately 1 to 7 witnessing this abusive behavior and unhealthy activity between his mother and father.

Irvin was raised solely by his mother. His mother is a good person, and a loving parent, but she had 3 other children, and Irvin was the youngest boy. His mother worked two jobs to support the family. She did not have a great deal of time to nurture and educate Mr. Griffin. As a matter of pride, his mother refused to ever take food stamps or to go on welfare. She also did not live

2

1  in Section 8 housing. Looking back, his mother regrets her

2  decision to work so much. She thinks that maybe if she had only

3  worked one job, she would have been able to provide a more stable

4  living environment for her son.

5      Irvin went to Antioch Middle School and Pittsburgh High

6  School. At Pittsburgh High School, his biggest passion was

7  athletics, particularly football. He will never be able to play

8  football again or run again since his injury. Playing sports used

9  to be Mr. Griffin's favorite thing to do in his entire life. He

10 cannot ever play sports again because he is confined for life to

11 a wheelchair.

12     Irvin was paralyzed when he was shot in the back. The bullet

13 lacerated his liver and both fractured and cleaved in half his

14 spine, paralyzing him.

15     After he was paralyzed, Irvin was very suicidal. He was

16 ready to give up on life because he can no longer walk. Over the

17 last few years though, Irvin's mother reports she has seen a

18 significant change in his outlook on life. He has become a

19 positive person, who wants to make something of his life. The

20 fact that it took such a tragic occurrence to wake Mr. Griffin up

21 to the fact that he needed to change his life is unfortunate,

22 however he is now doing his best to grow into a contributing

23 member of society. He attends college at Diablo Valley Community

24 College and he goes to church every Sunday.

25     Irvin is totally dependent on his family members on a daily

26 basis to care for him. He has to use catheters. His mother has to

27 buy him Pampers because he is unable to go to the bathroom on his

28 own. All of the individuals he thought were his friends have

3

abandoned him. The only people remaining in his life are his family and Crystal and the people he knows from church. It is a struggle to take care of Irvin. In order to take him anywhere, his mother must pick him up and strap him into the car and then unstrap him when they arrive. Irvin weighs about 100 pounds according to his mother. He is able to push himself in the wheelchair, but the rest of his body is very weak and decrepit.

When he was taken to Sacramento County Jail he was over-medicated. The jail staff gave him all of his medication in the morning, when he needed to receive his medication at multiple set times throughout the day. When he was released to his mother, she was not able to give him his medication for almost a week because his system was overloaded. Irvin had bed sores on his bottom from his time spent in jail. One of the sores had to be surgically removed because it was infected. Irvin also had a bladder infection from his time in jail.

Irvin can't do much at all on his own. He does not go anywhere unless his mom or Crystal takes him somewhere. All of his old friends have abandoned him. He is usually at home where he lives with his mother, sitting in his wheelchair doing schoolwork, watching television, or playing a video game. On Sunday he goes to church with Crystal, his mom, and Crystal's son, Jassan, who treats Irvin like he is his father.

Irvin's life has been irrevocably altered by the injury he suffered. He will never walk again. He goes to Alta Bates hospital between one to two times a month for continuing medical care. He will be confined to his wheelchair until he dies. His best hope is to make something of his life now that he has

4

suffered this injury and has clearly seen how foolish and wrong the way he was living was. He has an opportunity to turn his life around, to go to school, and to become a contributing member of society. He honestly and sincerely wants to do this.  He is permanently confined to a wheelchair. He cannot dress or bathe himself. In order to clean himself, his mother or Crystal must run a bath for him and pick him up and put him the bathtub. He is a fragile, helpless, sickly man who cannot control his own bowels, who has spasms, and who has repeated debilitating urinary tract infections. Mr. Griffin speaks in an almost inaudible, low whisper. He is for all intents and purposes a completely broken man. He is entirely dependent, like a baby, on his mother and Crystal so that he can complete the daily tasks necessary to maintain his health.

In addition to the obvious detriment to his health it will be to place Mr. Griffin in prison, the placement will almost certainly lead to him being victimized and brutalized by able bodied inmates. His risk of being victimized is excessively high and he has no way to defend himself.

II.

**A DOWNWARD DEPARTURE FOR AN EXTRAORDINARY PHYSICAL IMPAIRMENT IS AUTHORIZED BY SENTENCING GUIDELINE § 5H1.4.**

The 9th Circuit Court of Appeals in the case of *United States of America v. Jose Natalio Martinez-Guerrero* (1992), 987 F. 2d 618, 621-622, held that, "Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range;

5

e.g. in the case of a seriously infirm defendant, **home detention**
**may be as efficient as, and less costly than, imprisonment.**
(emphasis added)."

Here, Mr. Griffin has an extraordinary physical impairment.
Mr. Griffin is completely paralyzed from the waist down. (*See*
Exhibit 1, Letter from Barbara Ridley, Nurse Practitioner, Alta
Bates Summit Medical Center, Disabled Community Health Clinic;
*see* Exhibit 2, Medical Records of Irvin Griffin). Mr. Griffin's
extraordinary physical impairment, his paraplegic condition,
coupled with his lack of bowel control and spastic body, requires
ongoing daily medical care. Since the date that Mr. Griffin was
shot, he has seen over 21 doctors at different medical facilities
throughout the Bay Area. He has had repeated bladder infections,
he has had health complications due to the spasms in his body and
his inability to control his bowels, he has been admitted to the
emergency room numerous times, he has had bullet fragments
removed because they were migrating in his body towards his
spine. He cannot feel or move any part of his lower body.

### III.

**MR. GRIFFIN HAS AN EXTRAORDINARY PHYSICAL IMPAIRMENT HE IS**
**PARAPLEGIC AND HE NEEDS DAILY MEDICAL CARE, AS OFTEN AS EVERY**
**FOUR HOURS.**

The medical records make clear that Mr. Griffin is a
paraplegic. Mr. Griffin was shot in the back and his spine was
fractured and cleaved in half by the bullet. (*See* Medical
Records, Exhibits 1 and 6). This spinal injury rendered him a
paraplegic. On top of the fact that he cannot feel his entire
lower body or move it, he has a number of other medical problems.
The bullet also damaged his stomach and liver. *Id.*

1    Mr. Griffin's nurse practitioner, Barbara Ridley writes "He

2    suffers from spasticity in his legs, for which he has to take the

3    medications Baclofen and Tizanidine four times a day, in order to

4    prevent severe spasms and uncontrollable movements that can

5    potentially throw him out of the wheelchair. He has a neurogenic

6    bowel and bladder which require special management, because he

7    lacks normal control of these functions. He has to catheterize

8    himself every four hours using special, sterile equipment, and do

9    a special bowel program every other day, using a mini-enema.'

10    (See Exhibit 1).

11    Nurse Practitioner Ridley has been treating Mr. Griffin

12    since his initial injury. Mr. Griffin is also under the care of

13    Dr. Hussam El-Gohary at Alta Bates Summit Medical Center. Dr. El-

14    Gohary wrote a "Prescribing Order for Supplies" for Mr. Griffin

15    on November 14, 2007, with the medical justification "Irvin is a

16    paraplegic male who has permanent urinary incontinence and needs

17    intermittent catheter and bags to evacuate his bladder and to

18    minimize the amount of bacteria reaching his bladder." (See

19    Exhibit 3, Prescribing Order for Supplies, signed by Dr. Hussam

20    El-Gohary).

21    On February 23, 2007, Mr. Griffin was seen by Dr. Eric R.

22    Mariotti, at John Muir Medical Center in Concord, California for

23    pressure ulcers. (See Exhibit 4, Medical Report Dictated by Eric

24    R. Mariotti, M.D.). The report notes that Mr. Griffin is a T12

25    paraplegic and that he has had 1 pressure decubitus in the past

26    and now complains of over the worsening left ischial decubitus

27    ulcer. This was discovered because there was a foul odor exuding

28    from Mr. Griffin. (See Exhibit 4).

1    On February 22, 2007, Mr. Griffin was brought to the
2 emergency room for pressure sores and ulcers on his hips and
3 buttocks. (*See* Exhibit 5).

4    The records show that Mr. Griffin needs ongoing treatment
5 for his extraordinary medical conditions. He must have someone
6 drain his bowels every four hours, and he will develop rotting
7 sores if he is not moved often. He has recurring urinary tract
8 infections, which can lead to fever or flu-like symptoms.

9    A.   It is unlikely that the BOP can provide adequate care
         for an individual in Mr. Griffin's medical condition.
10

11   The President of the National Association of Criminal
12 Defense Lawyers (hereinafter "NACDL") Cynthia Hujar Orr, wrote an
13 article discussing this issue in the April 2010 issue of the
14 Champion Magazine. In her article entitled "From the President,"
15 Ms. Orr, a well respected federal criminal defense practitioner
16 discusses her thoughts as she prepared to testify in Washington
17 D.C. to testify before the U.S. Sentencing Commission. (Champion
18 Magazine, *From the President*, April 2010, Vol. XXXIV, No. 3, p
19 5 and 14, National Association of Criminal Defense Lawyers). Ms
20 Orr's article illustrates that the problem we are facing here
21 with the Bureau of Prisons, is a problem that occurs nationally
22 on the federal level. She states "The Bureau of Prisons always
23 tells sentencing courts that it can take any inmate and that it
24 *can* accommodate any handicap, mental health issue or physical
25 illness. However it is high time that courts stop accepting these
26 empty promises. While the Bureau can *theoretically* provide
27 medical care, it will never put a representative on the stand to
28 testify that it *will* provide the care required. It sets its own
   substandard regimen of care and cannot guarantee that it can meet

8

1    even this substantially lowered treatment plan." *Id.* at 14.

2        This is the same concern we have here in Mr. Griffin's

3    matter. As Ms. Orr points out, in discussing one of her own

4    matters, "The Bureau of Prisons reported to the probation office

5    that it could handle his health care needs. This was true, but

6    only if you consider it adequate or even wise to rely on another

7    inmate for diapering and assistance with eating, clothing, and

8    cleaning. It is true only if you believe that doctors will pay

9    higher premiums for the malpractice insurance required to treat

10   inmates. Given the medications my client had to take and his

11   physical limitations, he was vulnerable to manipulation. His

12   inability to communicate and life-threatening asthma made his

13   existence in prison precarious at best." *Id.* at 14.

14                                  IV.

15   **THE DISTRICT COURT SHOULD MAKE A FINDING THAT MR. GRIFFIN HAS**
     **AN EXTRAORDINARY PHYSICAL IMPAIRMENT, THAT THIS EXTRAORDINARY**
16   **PHYSICAL IMPAIRMENT RESULTS IN EXTREME VULNERABILITY, AND THAT**
     **IF INCARCERATED, MR. GRIFFIN'S POTENTIAL FOR VICTIMIZATION IS**
17                                  **HIGH**

18       In *Martinez-Guerrero* the court held that a departure under

19   *section 5H1.4* involves a two-step process. The two-step process

20   is that the district court first makes a factual finding to

21   decide whether the defendant's physical and mental disabilities

22   constitute an extraordinary physical impairment, and if the court

23   so finds, it should then consider whether the condition warrants

24   a shorter term of imprisonment or an alternative to confinement.

25   *Martinez-Guerrero*, 987 F. 2d 618 at 620. The court held that "The

26   ability of the Bureau of Prisons to accommodate a disability is

27   a factor which the district court may consider in making this

28   factual finding. But it is not the only factor." *Id.*

The *Martinez* court cited to a number of cases, approving various grounds for a downward departure. *See United States v. Long*, 977 F. 2d 1264 (8th Cir. 1992) (district court's downward departure under section 5H1.4 affirmed on grounds that 'an extraordinary physical impairment that results in extreme vulnerability is a legitimate basis for departure); *United States v. Lara*, 905 F. 2d 599, 603-05 (2d. Cir. 1990) (district court's downward departure affirmed based on the defendant's 'potential for victimization' due to a combination of USSG §§ 5H1.1 (age), 5H1.3 (mental condition) and 5H1.4).

**V.**

**RATHER THAN BEING VIEWED IN THE ABSTRACT, A DEFENDANT'S PHYSICAL CONDITION MUST BE ASSESSED IN LIGHT OF THE SITUATION THE DEFENDANT WOULD ENCOUNTER WHILE BEING IMPRISONED.**

The 7th Circuit Court of Appeals held in *United States of America v. Albarran*, 233 F. 3d 972, 979 (2000), that the district court must not view the particular defendant in the abstract, but must make a determination based on the evidence of medical condition presented to the court. Mr. Griffin has provided this court with medical records.

**VI.**

**THE COURT SHOULD PERMIT A VARIANCE FROM THE GUIDELINES AND/OR GUIDELINE RANGE AFTER A DOWNWARD DEPARTURE TO TIME SERVED AND 2000 HOURS OF COMMUNITY SERVICE TO BE COMPLETED DURING A PERIOD OF SUPERVISED RELEASE OF 10 YEARS.**

The landmark decision in *United States v. Booker*, 160 L.Ed.2d 621, 125 S.Ct. 738 (2005), changed sentencing in the Federal Court. *Booker* renders the Guidelines as advisory only, and instructs the sentencing courts to consider the Guidelines in context of all those factors enumerated in Title 18 USC 3553(a).

10

The Supreme Court addressed the issue of the "presumption of reasonableness" of a within Guidelines sentence in *Rita v. United States*, 127 U.S. 2456, 168 L.Ed. 2d 203 (2007) and instructed that a within Guideline sentence is presumed reasonable only upon appellate review. The Court stated:

"We repeat that the presumption before us is an *appellate* court presumption. Given our explanation in *Booker* that appellate "reasonableness" review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review. The sentencing judge, as a matter of process. will normally begin by considering the presentence report and its interpretation of the Guidelines. 18 U.S.C. Section 3552(a); Fed. Rule Crim. Proc. 32. He may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines, to apply, USSG Section 5 K2.0, perhaps because the Guidelines sentence itself fails properly to reflect Section 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. *See* Rule 32(f). Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. *See* Rules 32(f), (h), (i)(1)(C) and (i)(1)(D), *see also Burns v. United States*, 501 U.S. 129, 136, 111 S.Ct. 2182, 115 L.Ed. 2d 123 (1991)(recognizing importance of notice and meaningful opportunity to be heard at sentencing). In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. *Booker*, 543 U.S. at 259-260, 125 S.Ct. 738, 160 L. Ed. 2d 621." at 214.

Further, the Court instructed:

"The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness. Even the Government concedes that the appellate courts may not presume that every variance from the advisory Guidelines is unreasonable." at 216.

In *Nelson v. United States*, 129 S.Ct. 890, 892, 172 L.Ed.2d 719 (2009), perhaps as a reminder and definitely for emphasis, the court stated:

11

"Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."

Indeed, in *Irizarry v. United States*, 128 S.Ct. 2198, 2202, 171 L.Ed. 2d 28 (2008), the Court ruled that a variance from the sentencing Guideline range did not even require notice to the parties.

The Ninth Circuit was heard on the presumption of reasonableness and directed that even on appeal the presumption of a Guideline sentence may not be reasonable. It stated:

"... A court of appeals may *not* presume that a non-Guidelines sentence is *unreasonable*. Although a court may presume on appeal that a sentence within the Guidelines range is reasonable, *Id.*, we decline to adopt such a presumption in this circuit." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008).

The Guideline range is simply the beginning of the analysis for sentencing, not the end. The Ninth Circuit stated:

"The Guideline's factor may not be given more or less weight than any other." So while the Guidelines are the 'starting point and initial benchmark' and must 'be kept in mind throughout the sentencing process,' the Guideline's range constitutes only a touch-stone in the district court's sentencing consideration." *United States v. Autery*, 555 F.3d 864, 8172 (9th Cir. 2009).

The Supreme Court has now articulated the process by which sentencing and appellate courts must implement the findings in *Booker*, including the admonition of *Rita*. The court has directed:

"As we explained in *Rita*, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range... As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the Section 3553(a) factors to determine whether they support the sentence requested

by a party. In so doing, he may not presume that the Guidelines range is reasonable... He must make an individualized assessment based on the facts presented. If he decides that an outside Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

... Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness.... But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the Section 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall v. United States*, 128 S.Ct. 586, 596-597, 169 L.Ed. 2d 445 (2007)(citations and footnotes omitted).

Before *Gall* and *Rita*, the 9th Circuit anticipated their instructions. It directed the sentencing court to accurately calculate the Guidelines, it may then determine if there are any justifiable departures from the Guidelines, and then consider the Guidelines as but one factor among all of the factors outlined in Title 18 USC 3553(a), to reach a reasonable sentence. *United States v. Menyweather*, 431 F.3d 692, 696 (9th Cir. 2005), reprinted as amended at 447 F.3d 625, 630 (9th Cir. 2006). *See, also, Carty, Id.* at 991-994. A formal determination of "departures," as required under a mandatory guideline system, may

be both redundant or unnecessary, under a unitary determination of reasonableness of a sentence.[1]    A determination of an allowable departure under the pre-*Booker* regime, however, may inform the court of the reasonableness of a sentence.   *United States v. Mohamed*, 459 F.3d 979, 986-87 (9ᵗʰ Cir. 2006).   *See, also*, *United States v. Cantrell*, 433 F.3d 1269, 1279 (9ᵗʰ Cir. 2006)(the district court is to first calculate the Guidelines accurately and then examine the sentence for reasonableness in light of 18 USC 3553(a)).   Further, the court said, "An error in determining the Guidelines range, or in understanding the authority to depart from that range, can prevent district courts from properly considering the Guidelines." *Menyweather*, *Id.* at 630.

The Court must now consider 18 USC 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   The court, in determining the particular sentence to be imposed, shall consider -

    (1)   The nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   The need for the sentence imposed -

        (a)   to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

        (b)   to afford adequate deterrence to criminal conduct;

---

[1] "The system of downward departures that still guides the sentencing court's determination of the Guidelines - recommended range as required under Section 3553(a)(4) does not preclude the court's discretion to consider other Section 3553(a) factors... Just because a consideration was improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime." *United States v. Garcia*, 497 F.3d 964, 971-72 (9ᵗʰ Cir. 2007).

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

The sentencing court is now required to consider factors that the Guidelines effectively prohibited from consideration (i.e.: Age, USSG 5H1.1; Education and Vocational Skills, USSG 5H1.2; Mental and Emotional Condition, USSG 5H1.3; Physical Condition Including Drug or Alcohol Dependence, USSG 5H1.4; Employment, USSG 5H1.5; Family Ties and Responsibilities, USSG 5H1.6; Socio-economic Status, USSG 5H1.10; Civic and Military Contributions, USSG 5H1.11; and Lack of Youthful Guidance, USSG 5H1.12.). *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005)(*en banc*). To consider the "history and characteristics of the defendant," the Court must now consider factors the Guidelines eschewed.[2]

Finally, the Supreme Court has cautioned that respect for the law is promoted in many ways, not always measured by the strictness of sentences or the nature of harsh sanctions. The Court stated:

> "... Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, *Id*. at 599.

---

2    The United States Sentencing Commission has recently submitted proposed amendments to the Congress, in part expanding the court's consideration of specific offender characteristics, such as age, mental health, military service, as relevant considerations at sentencing.

1    In order to meet the mandate of the *Booker* remedy, then,
2    this court must calculate the appropriate guidelines range and
3    may consider appropriate departures.  It must also then apply the
4    3553(a) factors and address any other specific characteristics of
5    the defendant or his offense that might impact the determination
6    of a "reasonable" sentence under the particular circumstances of
7    this case.  The court must then consider the statutory parsimony
8    provision and impose a sentence "sufficient, but not greater than
9    necessary to comply with the purposes set forth in [Section
10   3553(a)(2)."] The district court's sentencing decision will then
11   be subject to an abuse-of-discretion review by the circuit.
12   Based on these perimeters, and all of the arguments in this
13   Sentencing Memorandum and those to be made at the sentencing
14   hearing, the defense (and, it is expected, the government) will
15   be recommending a downward variance to time already served, a
16   term of supervised release of 10 years, with a condition that Mr.
17   Griffin serve 2000 hours of community service during the
18   supervised release term.

19                              **VII.**

20   **MR. GRIFFIN'S GUIDELINE RANGE SHOULD BE 57-71 MONTHS AND HE
21   SHOULD RECEIVE A COMBINATION OF A DOWNWARD DEPARTURE UNDER USSG
     5H1.4 AND A DOWNWARD VARIANCE UNDER 18 USC SECTION 3553(a) TO
22   TIME SERVED, 10 YEARS SUPERVISED RELEASE AND 2000 HOURS OF
     COMMUNITY SERVICE DURING HIS SUPERVISED RELEASE TERM**

23   The original Presentence Report in this matter dated
24   February 13, 2009, found that the appropriate Guideline Range is
25   92-115 months.  The Probation Officer recommended a downward
26   variance, pursuant to 18 USC Section 3553(a) of 60 months, due to
27   Mr. Griffin's medical condition and the sentences of his co-
28   defendants.  This represented a downward variance of 32 months

                              16

from the low end of the recommended guideline range.

On or about January 15, 2010, the defense, pursuant to this Court's scheduling order, and Local Criminal Rule 32-460(d), Informal Objections to the Presentence Report. Thereafter, defense counsel and United States Probation Officer Scott Storey met and conferred about issues in connection with the Probation Report. United States Probation, as a result of that meet and confer, filed an amended Presentence Report, adjusting Mr. Griffin's Criminal History Category from IV to III, and his recommended Guideline range from 92-115 months to 78-97 months. Although the low end of the Guidelines in the amended Presentence Report was lowered from 92 to 78 months, or 14 months, the Probation Officer, reduced the recommended downward variance from 32 months to 18 months, and recommended the same ultimate sentence of 60 months.

In the meet and confer, counsel further discussed Mr. Griffin's objection that there should not be an upward adjustment of two levels under USSG Section 2B3.1(b)(4)(B). Mr. Griffin has reviewed the discovery in this matter. No alleged victim or surveillance photograph identified Mr. Griffin. No witness says that it was he, as opposed to Mr. Peterson, who physically restrained the victim. The probation officer, in the meet and confer, was unable to point to which victim statement and which surveillance picture showed Mr. Griffin physically restraining a female victim. Counsel has been unable to locate these materials. Because the government has not shown, by a preponderance of the evidence, that it was Mr. Griffin who physically restrained a victim, there should not be a two point

17

1    upward adjustment under USSG Section 2B3.1(b)(4)(B).

2         Further, one of Mr. Griffin's Criminal History Points

3    resulted from an adult conviction for loitering in a public

4    place, and another point for resisting arrest as a juvenile when

5    he was 16.  Under USSG Section 4A1.2(c)(1), the resisting arrest

6    point should not be counted unless Mr. Griffin received a

7    sentence of at least 30 days.  Because the records indicate that

8    Mr. Griffin was continued as a ward of the court, it is unclear

9    whether he actually served 30 days in juvenile hall as a sentence

10   for this juvenile allegation.    Further, under USSG Section

11   4A1.2(c)(2), the loitering conviction should never be counted.

12   Therefore, Mr. Griffin should receive either 2 or 3 criminal

13   history points and be placed in Criminal History Category II.  In

14   the alternative, the overall facts of Mr. Griffin's criminal

15   history justify a downward departure, under USSG Section 4A1.3 to

16   Criminal History Category II.  All of these points were discussed

17   with United States Probation during the meet and confer, in

18   furtherance of the informal objections filed by Mr. Griffin on

19   January 15, 2010 - but were ultimately rejected in the final

20   version of the Presentence Report.

21         Therefore, it is the defense position that the correct

22   advisory Guideline range, prior to departure,  is 57-71 months -

23   that is, level 24, Criminal History Category II.  United States

24   Probation has identified USSG Section 5H1.4, extraordinary

25   physical impairment, as a potential ground for downward departure

26   - before the consideration of any potential variance.  *See*

27   Amended Probation Report, at paragraph 56.   Based upon Mr.

28   Griffin's medical condition, medical records, and current

                                    18

prognosis, as is detailed in the attached Exhibits and as will be further detailed at the sentencing hearing, Mr. Griffin should receive a downward departure of 15 levels to level 11. That will result in an advisory Guideline Range of 6-12 months, prior to the Court applying any downward variance - which, we believe, should be to time served (of approximately 7 days), and 2000 hours of community service over a supervised release term of 10 years.

It should be noted that United States Probation, in initially recommending a downward variance of 32 months, and later recommending a downward variance of 18 months, took into consideration Mr. Griffin's physical condition and the sentences of his co-defendants. Mr. Blanche, because of his concurrent sentence, and Mr. McClary, who received a 51 months sentence, both received sentences less than the 60 months recommended by United States Probation, and neither defendant was suffering from any physical impairment, let alone the extreme one from which Mr. Griffin now suffers. In addition, Mr. Bradley, in a related case, is, as is understood by Mr. Griffin and counsel to be legally blind. While his recommended Guidelines were in the 140 month range, the Court granted a downward variance to 70 months - or what amounted to approximately nine additional months from the date of sentencing. Both the government and Mr. Bradley had argued for time already served. Mr. Bradley, while suffering from an unfortunate condition, was already in custody, and his disability is simply not as extreme or horrific as the one from which Mr. Griffin suffers.

1      Alternatively, the Court should grant a downward departure,

2   pursuant to USSG Section 5H1.4 of 8 levels either from the from

3   the 78-97 month Guideline recommended by United States Probation,

4   or from the 57-71 month Guideline Range as recommended by

5   defense.  This would result in a Guideline Range of 24-30 months

6   - if the starting point is the defense recommendation, and 33-41

7   months if the starting point if the recommendation of United

8   States Probation.  Then, the Court should grant Mr. Griffin the

9   32 month variance initially recommended by United States

10  Probation, and sentence Mr. Griffin to home detention for one

11  month, and 1800 hours of community service over a period of

12  supervised release of 10 years.

13      Alternatively, if the Court finds the appropriate Guideline

14  Range is 6-12 months, Mr. Griffin should be sentenced to 6 months

15  of home confinement, and 1000 hours of community service over a

16  period of supervised release of 10 years.

17      It is expected that the government, having reviewed Mr.

18  Griffin's medical records and his current condition, will be

19  filing a sentencing memorandum and recommendation of time already

20  served, and 2000 hours of community service to be performed over

21  an extended period of supervised release.  This is, obviously, a

22  significant consideration for the Court because the United States

23  Attorney well knows the gravity of the allegations in this

24  matter, and is not at all known for anything other than pushing

25  for full prosecution and punishment. The joint recommendation in

26  this matter is one that we hope will be followed by the Court.

27  It is a recommendation which combines compassion with justice,

28  and is consistent with the Guidelines and the law, as outlined in

1  this Sentencing Memorandum.

2                              **VIII.**

3                      **SENTENCING LETTERS**

4       Mr. Griffin requests that the Court consider the sentencing

5  letters attached as Exhibit 7.

6                               **IX.**

7                          **CONCLUSION**

8       For the reasons described above, the defense respectfully

9  asks the Court to sentence Mr. Griffin to time already served and

10  a period of time of supervised release of 10 years during which

11  Mr. Griffin is to perform 2000 hours of community service.

12                          Respectfully submitted,

13                          **BAY AREA CRIMINAL LAWYERS, PC**

14  Dated: May 27, 2010        By: /s/ David J. Cohen
15                              DAVID J. COHEN, ESQ.

16                          Attorneys for Defendant **Griffin**

17

18

19

20

21

22

23

24

25

26

27

28